# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| v. | § | Criminal No. B-13-210 |
| | § | |
| EDUARDO "EDDIE" LUCIO | § | |
| | § | |

### Memorandum Opinion and Order

The issue before the Court is whether John Blaylock (hereinafter "Blaylock"), counsel for Defendant Eduardo Lucio (hereinafter "Lucio" or "Defendant"), may remain as defense counsel in the above-styled cause. Having reviewed the facts and the applicable law, the Court finds that an actual conflict between Blaylock's personal interests and those of his client Lucio exists; and that there is a serious potential for yet another conflict between them to emerge at trial. To protect Defendant's Sixth Amendment right to effective assistance of counsel and to ensure the fairness of the judicial proceeding before it, the Court is left with no choice but to **ORDER** Blaylock **DISQUALIFIED** from representing Lucio in this matter. The Court hereby additionally **DENIES in part** Defendant Lucio's Motion for Sanctions Due to Manufacturing Actual, Unwaiveable Conflict; and/or Motion for Hearing Relating to Late Disclosure; alternatively, Motion to Sever [Doc. No. 116].[1]

---

[1] The Court by previous order has already granted the portion of the motion requesting a severance. [*See* Order, Doc. No. 139 at 1-2].

## I. Factual Background

This Court has previously discussed the factual particulars that gave rise to this issue. [*See* Order, Doc. No. 139 at 3-4, 6]. The Court nonetheless repeats the critical facts here.

On January 28, 2013, the Court held an *in camera* conference with all counsel present to discuss an intercepted communication between Blaylock and former State District Judge Abel C. Limas, an anticipated principal government witness against Lucio.[2] In that 2008 conversation, former Judge Limas and Blaylock discuss the flight from this jurisdiction of a certain criminal defendant that Judge Limas had sentenced in his court, and then released from custody. The focus of the discussion was the impact (and ways to lessen the impact) that the escape was having on Judge Limas' then current re-election campaign. Specifically, Blaylock mentions that in reaching out to potential supporters on behalf of Judge Limas, he had been confronted several times with questions regarding the escape. He asks Judge Limas how he should respond to such inquiries. Judge Limas states that he has "the transcript" where "they [the DA's office] didn't object" and that "it was a deal that was done by everybody." "And it was, I don't know why you're not publicizing that," Blaylock responds; to which Judge Limas emphatically answers, "Because I can't."[3]

---

[2] The Court held this conference in chambers per Defendant's request. [*See* Def. Lucio's Supplement to His Mot. to Sever Due to Government's Introduction of Audio Between Counsel and its Cooperating Witness, Doc. No. 102 at 1].

[3] A .wav file of the recording in question was provided to the Court in a sealed fashion. [*See* Letter to the Court, Doc. No. 110 Attach.].

The circumstances surrounding this criminal defendant's escape also form, in part, the factual bases for the criminal allegations against Defendant in Counts Three and Four of the Superseding Indictment. [*See* Doc. No. 84 at 17-20]. Specifically, in Count Four, the Government alleges that Lucio aided and abetted Hobbs Act extortion. The factual allegations for the Count are that Lucio enabled Judge Limas to obtain illicit monies, and in exchange, that Judge Limas agreed to remain silent regarding the events that allegedly led to this criminal defendant's escape. Given that the overall content of the intercepted communication supports the Government's theory of both Limas' and Lucio's motives to commit the crime alleged in Count Four, the Government had listed the recording as a proposed exhibit. [*See United States v. Villalobos*, No. 1:12-cr-374, Doc. No. 104 at 9].

The Court, while not making an advisory ruling on its ultimate admissibility, had and still has little doubt that the recording will eventually become admissible.[4] Accordingly, upon learning of the recording's existence, the Court became gravely concerned that its admittance into evidence would give rise to a conflict of interest between Blaylock and Lucio; specifically, that Blaylock could become a witness

---

[4] This Court has already presided over two similar criminal trials, both involving allegations of RICO and Hobbs Act violations against two other attorneys that practiced in the local area. *See generally United States v. Marchan*, No. 1:11-cr-594; *United States v. Rosenthal*, No. 1:11-cr-743. At both trials, Judge Limas proved to be a critical witness, and his credibility was strongly called into question by the defense. Most recently, during a pre-trial hearing on exhibit admissibility held in *United States v. Villalobos*, No. 1:12-cr-374, defense counsel for Villalobos, Lucio's previous co-defendant, challenged Judge Limas' veracity; counsel explicitly stated in open court that "Limas' credibility is at issue" and further that "[j]ust because Limas says something doesn't mean it's true." This experience further bolsters the Court's confidence in its prediction that Judge Limas' credibility will become an issue at Lucio's trial; and that his prior consistent statements, such as those on the recording in question, will ultimately be relevant and admissible. *See* Fed. R. Evid. 801(d)(1)(B).

against Lucio at trial. Following the conference, the Court ordered the parties to submit proposed resolutions regarding this issue.

In response, the Government agreed to not offer the exhibit in its case-in-chief, but reserved the right to offer it in rebuttal. [*See* Government's Br. in Resp. to the Court's Inquiry Concerning Representation by Counsel, Feb. 8, 2013, Doc. No. 114 at 3-4]. The Government further agreed not to object to Blaylock remaining on the case, so long as Lucio waived any conflict of interest that may come to fruition at trial. [*Id.* at 7-8]. In contrast, Defendant Lucio took the position that the conflict was "unwaiveable." [Def. Lucio's Mot. for Sanctions Due to Manufacturing Actual, Unwaiveable Conflict; and/or Mot. for Hr'g Relating to Late Disclosure; alternatively, Mot. to Sever, Feb. 8, 2013, Doc. No. 116 at 1, 9, 12]. Citing the ABA Model Rules of Professional Conduct, Defendant noted that "an attorney may not represent a defendant in a criminal case and at the same time be a trial witness . . . ." [*Id.* at 9]. Furthermore, "a conflict that amounts to a breach of the code of professional ethics [,]" Defendant argued, "obviously qualifies" as a conflict of interest for which this Court may insist on defense counsel's disqualification. [*Id.* at 16].

Defendant maintained, however, that Blaylock was his counsel of choice. [*See id.* at 2]. To balance the "unwaiveable" conflict discussed above with his continuing desire for Blaylock to represent him, Defendant argued to the Court that the Government "manufactured" the conflict. [*Id.*] Distilled to its essentials, Defendant's argument is that the prosecution had a duty to disclose the conflict, that the Government chose not do so until it was too late, and that the late disclosure was really a veiled attempt to remove Blaylock, who had proven to be an effective advocate, from the case. [*See id.* at 2, 5-9].

4

"The government should be sanctioned for manufacturing this conflict and the Court should not look to Mr. Lucio to solve a problem created by the government's failure to disclose." [*Id.* at 2]. Defendant did not indicate in the motion the specific sanctions he was seeking, although one assumes the suppression of the recording in question to be among the remedies sought.

To solve any potential advocate-witness problem, furthermore, Defendant strongly advocated that a severance was necessary [*id.* at 3, 9-11, 18]; otherwise, Defendant argued, the Court would virtually ensure that Blaylock would become a witness. "Mr. Lucio's co-defendant not only has a need to call the undersigned[, Blaylock,] as a witness, he has an incentive to do so." [*Id.* at 3]. As for the Government, Defendant stated, it "may or may not call him as a witness depending on whether they approve or disapprove of his or the co-defendant's cross-examination." [*Id.* at 9]. "Mr. Villalobos[, however,] cannot be forced to forego a full and vigorous cross-examination and his rights would not be affected by calling the undersigned." [*Id.* at 3]. Defendant thus explained why a severance was necessary:

> [T]he undersigned can control himself during argument or cross-examination of Mr. Limas and avoid "opening the door." However, the undersigned cannot control the counsel of Mr. Villalobos . . . a severance is the only way to eliminate the risk to Mr. Lucio of his co-defendant opening the door to the detriment of Mr. Lucio.

[*Id.*]. Defendant assured the Court that he would not call Blaylock as a witness if a severance were granted. [*Id.*] Defendant also explicitly stated, however, that in the event that the recording was admitted at trial, "the danger to Mr. Lucio is that the undersigned will likely be called by the government in rebuttal, by co-defendant Villalobos . . . or

5

even, *by the defendant himself* as he has been forced into this untenable position." [*Id.* at 2 (emphasis added)].

The Court told the parties that it was inclined to sever Defendant's case during a telephonic hearing held on March 11, 2013. The Court then granted Defendant's motion to sever in open court on March 19, 2013. [Mot. Hr'g Tr. 2:17, March 19, 2013. *See also* Doc. No. 139 at 1-2]. In doing so, the Court relied in part on Lucio's representation that the severance would cure the conflict problem. To further accommodate Lucio's counsel of choice, moreover, the Court suggested that the parties stipulate to using a transcript of the recording in lieu of the actual tape, and redact the references to Blaylock in the transcript; for instance, by only identifying the speakers as Judge Limas and an "unidentified lawyer." [Tr. 7:1-11].[5] In that manner, Blaylock would not by name be implicated in the factual events underlying the criminal allegations. No risk would therefore exist that the jury would question Blaylock's integrity as an advocate for Defendant by virtue of his peripheral involvement in the facts as evidenced by the recording, and any potential need for Blaylock to take the stand would presumably be erased. The Government agreed to the suggestion. [Tr. 7:5-6].

Defendant, on the other hand, refused to provide this Court with his position regarding the proposed redaction. Instead, Defendant countered, in accordance with his motion for sanctions, that since the Government "manufactured" the conflict to deprive him of his counsel of choice, the Government should be prohibited from using

---

[5] The Court suggested this course of action as one potential curative measure short of disqualification. *See United States v. Diozzi*, 807 F.2d 10, 14 n.8 (1st Cir. 1986) (suggesting redaction as alternative to disqualification where defense counsel was witness at trial).

the recording at all. [Tr. 7:19-8:1]. Even after the Government had agreed to the redaction proposal, Blaylock continued to argue that he may "as a matter of ethics," have to "bow out;" that the Government had created a conflict that was "unwaiveable;" and that both he and his client were put in a "terrible position." [Tr. 8:2-15].[6]

  As a final measure, the Court conducted a *Garcia* hearing to ensure that Lucio could, if he so wished, waive the conflict and retain Blaylock as his counsel of choice. [Tr. 9:10-13:13. *See also* Doc. No. 139 at 5-6].[7] The Court should note that Lucio is a practicing criminal defense attorney, himself, so he clearly comprehends the ethical dilemma. Nevertheless, to ensure that there could be no question as to a "knowing" waiver, the Court further ordered Defendant after the *Garcia* hearing to consult with a third independent attorney regarding the situation and then report back to the Court with his ultimate decision. [*See* Doc. No. 139 at 6-7]. Defendant, having complied with the Court's order, opted not to waive his right to conflict-free representation. [Def. Lucio's Resp. to Court's Question on Disqualification of His Counsel, Doc. No. 140 at 4]. Defendant remained steadfast that "the conflict and/or conflicts that now exist with the undersigned[, Blaylock,] are 'unwaiveable.'" [*Id.* at 1].

---

[6] Defendant has clearly reneged on his earlier position that a severance would cure this problem.

[7] "If a defendant chooses to proceed with representation by counsel who has a conflict of interest, a district court must conduct what is commonly known as a '*Garcia* hearing' to ensure a valid waiver by the defendant of his Sixth Amendment right." *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006) (citing *United States v. Garcia*, 517 F.2d 272, 278 (5th Cir. 1975), *abrogated on other grounds*, *Flanagan v. United States*, 465 U.S. 259, 263 (1984)).

Counsel further objected to any redaction as "fruitless." [*Id.* at 2].[8] In spite of his recognition of the conflict at issue and his position that it is "unwaiveable," Defendant, somewhat incredulously, continues to express his desire for Blaylock to remain as his attorney. [*Id.* at 1 n.1 (reasserting the pending motion for sanctions discussed above)].

## II.    Present Dilemma

The Government has maintained that it will seek the introduction of the recording in both the original (Villalobos) and now severed (Lucio) cases. [*See United States v. Villalobos*, No. 1:12-cr-374, Doc. No. 150 at 9 (Villalobos); Mot. Hr'g Tr. 5:15-6:7, March 19, 2013 (Lucio)]. Given the recording's likely admissibility, two issues have arisen regarding Blaylock's continued representation. First, Blaylock readily admitted, as discussed above, that he will cabin his cross-examination of Judge Limas to avoid "opening the door" to Blaylock's own participation, however marginal, in the facts underlying the criminal allegations. Second, if the recording is admitted, Blaylock may effectively be compelled to take the stand. As Blaylock, himself, represented to this Court during the earlier conference held in chambers, his position is that if the recording was admitted into evidence, he will be forced to testify at trial. Blaylock has given this Court no indication since this *in camera* conference that his position on this issue has changed.[9]

---

[8] Even if the recording were redacted at his trial, Defendant argued, "[t]he government would nonetheless accomplish the prejudicial effect it seeks by offering the conflict evidence at Mr. Villalobos' trial . . . ." [Doc. No. 140 at 2]. The Court finds this position to be meritless as the trials have now been severed.

[9] Even after the severance was granted and even after the Government agreed to the proposed redaction, Defendant continued to equivocate on the issue of whether the defense would call Blaylock as a witness. This Court can only conclude Lucio is doing this in order that he may be able to object regardless of which

Neither of the scenarios discussed above are sanctioned by the rules of ethics. First, a criminal defendant, whose freedom is at stake, is always entitled to counsel that will defend him zealously against those criminal charges. In no instance should defense counsel, as Blaylock admitted he would, temper cross-examination to serve counsel's own interests.

Secondly, the applicable ethical rules constrain Blaylock from testifying while still remaining defense counsel at trial. This Court, of course, has no way of knowing at this time if Blaylock will testify; and if he testifies, whether the testimony will comport, or conflict, with the defense's strategy in this case. Certainly the defense has not apprised this Court as to the substance of Blaylock's potential testimony. Nonetheless, only two real possibilities are at issue. (Obviously, there could be a combination of the two.) The first is that the substance of Blaylock's testimony will be favorable to his client, and provide an explanation of the intercepted communication compatible with the defense's strategy. The second possibility is that Blaylock's testimony will be adverse to Lucio and confirm the Government's evidence as to motive. The former situation—counsel testifying on Lucio's behalf—involves Blaylock assuming the dual advocate-witness role as to an issue that will certainly be hotly contested by the parties. As such, Blaylock will put his own credibility into question and risk his effectiveness as an advocate on behalf of Lucio. The second situation involves Blaylock testifying adversely to his client, giving rise to a clear conflict of interest between

---

way the Court rules, in keeping with his "have his cake and eat it too" strategy that the Court explains below.

Blaylock's duty to testify truthfully and Lucio's interest to avoid adverse testimony. This possibility is even more precarious (and certainly, as it stands now, and as indicated by the content of the recording itself, is the one most likely to occur).

In spite of all this, Lucio has remained steadfast before the Court that he wishes for Blaylock to remain his counsel. At the same time, however, Lucio has refused to waive any conflict of interest under which Blaylock is, or may eventually operate; in fact, Lucio's position is that the conflicts are "unwaiveable." The only conclusion that this Court can reach from this inherent contradiction is that Lucio, in effect, is trying to have his cake and eat it too. He wants to have an appellate issue regardless of the way this Court rules. That being the case, the Court is now forced to resolve the question.

The issue before the Court is whether Blaylock may continue representing Lucio in this matter, in accordance with Defendant's right to counsel of choice, under the onus of the conflicts discussed above, which would contravene Defendant's right to effective assistance of counsel and conflict-free representation. "Unfortunately for all concerned, a district court must pass on [this] issue . . . not with the wisdom of hindsight after the trial has taken place, but in the murkier pre-trial context when relationships between parties are seen through a glass, darkly." *Wheat v. United States*, 486 U.S. 153, 162 (1988). Nonetheless, the Court has been provided with sufficient facts to know that counsel's disqualification is necessary. First, Blaylock has readily admitted that he intends to scale back his cross-examination of Judge Limas. He has essentially told this Court he will pull his punches and not represent Lucio as zealously as he should or that another (conflict-free) attorney would. The Court thus finds that this admission is not only a concession that an actual conflict between Blaylock and Lucio exists, but that the

10

conflict will have an untoward effect at trial. Secondly, Blaylock has previously indicated to this Court that if the recording/transcript were admitted, he would feel compelled to testify. The potential substance of Blaylock's testimony is all but immaterial; under these facts, Blaylock's becoming a witness at all, whether favorable or adverse to his client, is in contravention of the governing ethical standards. The Court therefore finds that in addition to the aforementioned actual conflict of interest, there is a serious potential that yet another conflict awaits these parties at trial.[10]

Accordingly, because there is an actual conflict and a serious potential for a second conflict of interest to materialize at trial, and in accordance with this Court's duty to protect Defendant's right to effective assistance of counsel and ensure the fairness of the proceeding, this Court has no choice but to hereby **ORDER** Blaylock **DISQUALIFIED**.

## III. Discussion

### A. Defendant's Sixth Amendment Rights to Counsel of Choice and Conflict-Free Representation, and the Trial Court's Duty to Ensure the Fairness of the Proceedings Before It

Defendant Lucio's resolute desire for Blaylock to continue representing him, in the face of having admitted the existence of and having refused to waive the

---

[10] The characterization of this conflict as one that is "potential" rather than "actual" is actually generous to the defense, as the dilemma at issue is already cognizable, and is according to the defense "unwaiveable." The Court refers to it as a potential conflict in order to distinguish the "testifying" problem from the "intention to not cross-examine Judge Limas vigorously" problem. The former will not come to fruition and its effects will not be known until trial—at a time when it will be too late for this Court to "fix" the harm. Given counsel's stated intentions, the latter ethical situation is immediately problematic and fixable now. Therefore, the Court uses those terms for descriptive purposes and not in their strictest technical sense.

conflicts discussed herein, is untenable. In essence, the contradiction has pitted two of Defendant's own Sixth Amendment rights against each other: "(1) the qualified right to be represented by counsel of one's choice, and (2) the right to a defense conducted by an attorney who is free of conflicts of interest." *Wheat*, 486 U.S. at 157. The right to conflict-free representation arises from the Constitution's guarantee of effective assistance of counsel. *See United States v. Infante*, 404 F.3d 376, 389 (5th Cir. 2005) ("Under the Sixth Amendment, if a defendant has a constitutional right to counsel, he also has a corresponding right to representation that is free from any conflict of interest." (internal quotation marks omitted)). *See generally Strickland v. Washington*, 466 U.S. 668 (1984); *Cuyler v. Sullivan*, 446 U.S. 335 (1980). A lack of effective assistance, moreover, implicates the very integrity of the system, as the adversarial process heavily depends on effective counsel to produce just results. *See United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006). "The right to select counsel of one's choice, by contrast, has never been derived from the Sixth Amendment's purpose of ensuring a fair trial." *Id.* "It commands, not that a trial be fair, but that a particular guarantee of fairness be provided—to wit, that the accused be defended by counsel he believes to be best." *Id.* at 146. The wrongful deprivation of a defendant's right to counsel of choice is therefore "structural error" not subject to harmless-error analysis. *Id.* at 148-52. *See also United States v. Sanchez Guerrero*, 546 F.3d 328, 332 (5th Cir. 2008) (citing *Gonzalez-Lopez*, 548 U.S. at 152).

The right to counsel of choice, however, is not absolute, *see Sanchez Guerrero*, 546 F.3d at 333, and is "circumscribed in several important respects," *Wheat*, 486 U.S. at 159. One such respect is precisely the situation before the Court today: when

a defendant's counsel of choice, if not disqualified, would otherwise labor under a conflict of interest. In such a case, the trial court has the discretion to order defense counsel's disqualification. *See Sanchez Guerrero*, 546 F.3d at 333. The court's "independent duty to ensure that criminal defendants receive a trial that is fair and does not contravene the Sixth Amendment" exists irrespective of the defendant's counsel of choice. *Wheat*, 486 U.S. at 161. The court must protect the "essential aim of the [Sixth] Amendment[, which] is to guarantee an effective advocate . . . rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* at 159.

Furthermore, the court must protect the integrity of the judicial system by "ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Sanchez Guerrero*, 546 F.3d at 333 (quoting *Wheat*, 486 U.S. at 160) (internal quotation marks omitted). *See also United States v. Greig*, 967 F.2d 1018, 1024 n.17 (5th Cir. 1992) ("Disqualification of an attorney can be based on either of the following grounds: (a) conflict of interest, or (b) integrity of the judicial system."). To balance these competing judicial duties—the first to protect defendant's right to his counsel of choice; the second to ensure a fair trial for the sake of both the defendant and the judicial system—the Supreme Court has held that a presumption exists in favor of the former. *See United States v. Gharbi*, 510 F.3d 550, 553 (5th Cir. 2007) (citing *Wheat*, 486 U.S. at 164). This presumption may be overcome, however, "by an actual conflict of interest, or by a showing of a serious potential for conflict." *Id.* (citing *Wheat*, 486 U.S. at 164).

**B.      Applicable Ethical Standards, and the Actual and Potential Conflicts of Interest**

There is no dispute that serious conflicts of interest are at play under these circumstances. Defendant, himself, has conceded to this Court that the conflict is "actual" and "unwaiveable."[11] Defense counsel has additionally suggested that he may have to "bow out" as a "matter of ethics." This Court agrees. Blaylock's concession that he will cabin his advocacy on behalf of Lucio to preclude the admissibility of the recording in question is literally an admission that the conflict exists and will manifest at trial to Lucio's detriment. Moreover, as a potential witness on what will certainly be a

---

[11] It is the lawyer's and not the Court's burden to raise potential conflicts of interest as an issue; the Court has no affirmative duty to conduct an inquiry unless first alerted to the possibility of a conflict by the parties. *See Greig*, 967 F.2d at 1022 (citing *United States v. Medel*, 592 F.2d 1305 (5th Cir. 1979)). *See also* Tex. Disciplinary Rules Prof'l Conduct R. 1.06 cmt. 17 ("Raising questions of conflict of interest is primarily the responsibility of the lawyer undertaking the representation."). In fulfilling this professional obligation, Blaylock has asserted the position, both in written motions and in open court, that the conflict at issue is "actual" and "unwaiveable." Lucio, an attorney himself, was present and did not object when Blaylock made these in-court statements. Pursuant to a court order, moreover, Lucio consulted a third attorney unconnected with the case. With the totality of this legal acumen, the defense's conclusion remains that the conflict exists and is "unwaiveable." The attorneys are privy to the entire gamut of facts surrounding the conflicts discussed herein; this Court is not. In light of counsel's judicial admissions, this Court need not go further in order to hold that an actual conflict between Blaylock and Lucio necessitates Blaylock's disqualification. *See United States v. Cravero*, 530 F.2d 666, 671-72 (5th Cir. 1976) ("Defense counsel clearly has the authority to make judicial admissions for his client during the course of the trial."); *Ergo Science, Inc. v. Martin*, 73 F.3d 595, 600 (5th Cir. 1996) ("What is clear is that the district court, as a matter of federal procedure, is entitled to rely on statements made by counsel in open court.").

Most judges, in fact, would have done just that. They would have relied upon these judicial admissions, found Blaylock to be disqualified and shepherded the case onto trial. This Court, in an attempt to accommodate Lucio's Sixth Amendment right to counsel of choice, went much further in the hopes of finding a workable solution. Its efforts were uniformly rejected by the defense, and part of the reasoning for this rejection was that Blaylock's conflict was "unwaiveable." While this Court does not necessarily agree that the conflict is unwaiveable, the fact that Lucio has refused to waive it makes the end result essentially the same. Thus, Lucio's judicial admission that the conflict is actual, in and of itself, is enough for this Court to disqualify Blaylock. This Court will nevertheless go further and analyze the situation as if Lucio has not conceded that an unwaiveable conflict exists.

contested issue, Blaylock may not assume the dual advocate-witness role while still conforming to this Circuit's ethical standards. "[W]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel . . . the court should not be required to tolerate an inadequate representation of a defendant." *Wheat*, 486 U.S. at 162 (internal quotation marks omitted). A contrary position would otherwise force this Court to ignore its independent duty to ensure the integrity of system, and the fairness of the trials before it. *See id.*

"We determine whether the integrity of the judicial system has been undermined by reference to the current national standards of legal ethics." *United States v. Vaquero*, 997 F.2d 78, 90-91 (5th Cir. 1993) (citing *In re Dresser Indus., Inc.*, 972 F.2d 540, 544 (5th Cir. 1992)). The Local Rules of the Southern District of Texas provide that the "minimum standard of practice" for lawyers practicing before the court "shall be the Texas Disciplinary Rules of Professional Conduct." Tex. R. of Court, Fed. app. A, R. 1 A. Fifth Circuit jurisprudence further consults "the ethical rules announced by the national profession in light of the public interest and the litigants' rights," *In re Am. Airlines*, 972 F.2d 605, 610 (5th Cir. 1992) (internal quotation marks omitted), a criterion that encompasses the ABA Model Code of Professional Responsibility and the ABA Model Rules of Professional Conduct, *see id. See also Wheat*, 486 U.S. at 160, 162 (considering ABA Model Code and Model Rules when ruling on defense counsel's disqualification).[12] Finally, in keeping with the Circuit's example, the Court consulted

---

[12] The ethical canons and disciplinary rules in the ABA Model Code of Professional Responsibility were superseded in 1983 by the adoption of the ABA Model Rules of Professional Conduct. *ABA Model Rules of Professional Conduct*, americanbar.org, http://www.americanbar.org/groups/professional_responsibility

the rules put forth in the *Restatement (Third) of Law Governing Lawyers. See Fed. Deposit Ins. Corp. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995) ("[T]he Restatement of The Law Governing Lawyers is indicative of the national consensus . . . within the profession.").

### 1. The Actual Conflict of Interest—Failure of Zealous Representation

The Texas Rules, Model Rules and *Restatement* all demand the same outcome when a concurrent conflict of interest would otherwise burden legal representation: withdrawal or disqualification. *See* Tex. Disciplinary Rules Prof'l Conduct R. 1.06; Model Rules of Prof'l Conduct R. 1.7; *Restatement (Third) of Law Governing Lawyers* § 125.[13] If the lawyer's representation would involve a concurrent conflict between the lawyer's personal interests and the interests of the client, all rule formulations instruct the lawyer to withdraw from the representation, unless the affected client consents after full disclosure to the conflict at issue. Here, as aforementioned, Lucio has refused to waive and consent to any conflict.

"A conflict of interest exists when defense counsel places himself in a position conducive to divided loyalties." *United States v. Garcia-Jasso*, 472 F.3d 239, 243 (5th Cir. 2006) (internal quotation marks omitted). The Texas Rules of Disciplinary Procedure further define conflict of interest as "any situation when a lawyer may not be

---

/publications/model_rules_of_professional_conduct.html (last visited April 8, 2013). (The former will be referred to as the Model Code while the latter [the current version] will be referred to as the Model Rules). The Court nonetheless references the ABA Model Code because of the reliance that controlling precedent has placed on it. Further, the Court's ruling would be the same regardless of any reference to the Code.

[13] The Model Code follows an identical approach. *See* Model Code of Prof'l Responsibility DR 5-101.

able to consider, recommend, or carry out an appropriate course of action for one client because of the lawyer's own interests . . . ." Tex. Disciplinary Rules Prof'l Conduct R. 1.06 cmt. 4. The Model Rules and *Restatement* describe conflicts of interest in a similar fashion. *See* Model Rules of Prof'l Conduct R. 1.7 cmt. [8]; *Restatement (Third) of Law Governing Lawyers* § 125 cmt. c.

As applied to criminal defense representation, the Fifth Circuit has specifically held that an actual conflict of interest exists when defense counsel's cross-examination of government witnesses is self-limited in order to serve an interest other than that of the defendant on trial. *See Infante*, 404 F.3d at 392-93. In *Infante*, Anthony Foster ("Foster"), who represented Infante, had previously represented two of the government's witnesses. *Id.* at 389-90. The court, apprised of the situation, held a hearing on the matter, during which Foster testified that if the previous clients/witnesses testified at trial, he would "pull [his] files and run over to the [g]overnment's office and ask for a Rule 35 [motion for reduction in their sentences for substantial assistance in the prosecution of Infante] on [behalf of] the former clients." *Id.* at 390 (internal quotation marks omitted). During trial, "Foster limited his cross-examination [of the previous clients/witnesses] to eliciting testimony that the witnesses had no knowledge of any involvement in the conspiracy by Infante." *Id.* His cross-examination did not question the witness' "credibility or motive for testifying against Infante (by, for example, delving into the details of their plea agreements or their hopes of receiving a reduction in their sentences for substantial assistance)." *Id.* The Fifth Circuit held that the circumstances illustrated an actual conflict of interest between Foster and his client Infante:

> Once [his former clients] took the stand to testify against Infante, Foster was put in a position conducive to divided loyalties because he had to choose between vigorously cross-examining his former clients, which might jeopardize their chances of the government filing a Rule 35 motion on their behalf, and not vigorously cross-examining them, which would risk allowing the government to establish through their testimony an essential element of the case against Infante . . . Thus, Foster labored under a conflict of interest.

*Id.* at 392-93.

Parallel to the court's conclusion in *Infante*, the Court finds that an actual conflict between Blaylock and Lucio has already come to fruition. It need not wait until trial to know the conflict is manifest, as Blaylock has already admitted to the Court that his cross-examination of former Judge Limas, a key, if not pivotal, government witness, will not be vigorous. [*See* Doc. No. 116 at 3]. In fact, counsel's argument for a severance relied explicitly on that fact: "The undersigned can control himself during argument or cross-examination of Mr. Limas and avoid 'opening the door' [to the recording]. . . Mr. Villalobos[, however,] cannot be forced to forego a full and vigorous cross-examination . . . [t]herefore, his interests are clearly opposite to Mr. Lucio's interests in avoiding Mr. Blaylock's testimony." [*Id.*].

Blaylock, therefore, while conceding that Villalobos, Lucio's former co-defendant, will receive the benefit of a vigorous cross-examination of former Judge Limas, equally concedes that Lucio would not receive this degree of advocacy if Blaylock remained his counsel. The critical shortfall in this rationale, of course, is that it ignores the obvious fact that Lucio, too, would benefit from the same vigorous cross-examination. "The right to cross-examination . . . is essentially a 'functional' right designed to promote reliability in the truth-finding functions of a criminal trial."

18

*Crawford v. Washington*, 541 U.S. 36, 74 (2004) (quoting *Kentucky v. Stincer*, 482 U.S. 730, 737 (1987)) (internal quotation marks omitted). Counsel's argument to the contrary—that Lucio deserves a more cabined cross-examination in order to avoid Blaylock's possible testimony—clearly demonstrates divided loyalties. *Cf. Infante*, 404 F.3d at 389-93. *See also Restatement (Third) of Law Governing Lawyers* § 108 cmt. e (explaining that a conflict of interest is present when lawyer is disinclined to testify in order to remain as advocate). Additionally, in light of the severance (granted at Lucio's behest), Lucio can no longer hope to benefit indirectly from Villalobos' counsel conducting an effective and zealous cross-examination of Judge Limas; now only Lucio's counsel can fulfill that role. The fact that Blaylock has admitted that he would not embark on the most forceful and full-fledged cross-examination of one of the government's key witnesses, in order to avoid taking the stand himself, leaves no doubt that a conflict of interest exists between Blaylock and Lucio. Lucio's refusal to consent to or waive this conflict, moreover, renders Blaylock's continued representation in clear contravention of the aforementioned ethical standards that govern representation and concurrent conflicts of interest.

### 2.    The Serious Potential for a Second Conflict of Interest

Blaylock would additionally contravene the rules of ethics if he remained defense counsel and became a witness in this matter, regardless of the substance of his testimony. Again, the Texas Rules, Model Rules, and *Restatement* all place limits on counsel's ability to be both an advocate and a witness in the same judicial proceeding. The Texas Rules provide the following in pertinent part:

> (a) A lawyer shall not . . . continue employment as an advocate before a tribunal in a contemplated or pending

> adjudicatory proceeding if the lawyer knows or believes
> that the lawyer is or may be a witness necessary to establish
> an essential fact of the lawyer's client, unless:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony will relate solely to a matter of formality
> and there is no reason to believe that substantial evidence
> will be offered in opposition to the testimony . . . [or]
>
> (5) the lawyer has promptly notified opposing counsel that
> the lawyer expects to testify in the matter and
> disqualification of the lawyer would work substantial
> hardship on the client.
>
> (b) A lawyer shall not continue as an advocate in a pending
> adjudicatory proceeding if the lawyer believes that the
> lawyer will be compelled to furnish testimony that will be
> substantially adverse to the lawyer's client, unless the client
> consents after full disclosure.

Tex. Disciplinary Rules Prof'l Conduct R. 3.08. The *Restatement* likewise follows a

similar structure. *See Restatement (Third) of Law Governing Lawyers* § 108. Advocates

may not testify on behalf of their clients unless the testimony relates to an uncontested

issue or if the attorney's disqualification would result in a substantial hardship on the

client. *Id.* If the testimony is adverse to the client, in no circumstance may counsel's

representation continue, unless the client consents after full disclosure to any conflict of

interest the lawyer's testimony would create. *Id.* The Model Rules, on the other hand, do

not differentiate standards based on whether the testimony is on behalf of or adverse to

the client. *See* Model Rules of Prof'l Conduct R. 3.7(a). The rule is the same in both

instances:

> A lawyer shall not act as advocate at a trial in which the
> lawyer is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issue;

(2) the testimony relates to the nature and value of legal services rendered in the case; or

(3) disqualification of the lawyer would work substantial hardship on the client.

*Id.*[14] The commentary following Model Rule 3.7(a) cautions, however, that the dual role of advocate and witness may also give rise to a conflict between the attorney's and client's interests. *Id.* cmts. [4], [6]. In such a circumstance, the commentary provides that the representation must satisfy both the constricts of Rule 3.7 and of Rule 1.7, discussed above, to conform to ethical standards. *Id.* cmt. [6]. Rule 1.7, again, prohibits representation when the lawyer and client have a concurrent conflict of interest, unless the "lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation[,]" and the client "gives informed consent, confirmed in writing." Model Rules of Prof'l Conduct R. 1.7. Under the Model Rules, a conflict of interest may be present "[e]ven when there is no direct adverseness," *id.* cmt. [8]; all that is necessary for a conflict to emerge is a "significant risk that the lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as result of the lawyer's other responsibilities or interests[,]" *id.* cmt. [8].

In the event that Blaylock remains defense counsel and thereafter becomes a witness at trial, it is clear that his testimony, whether adverse or favorable to his client,

---

[14] The Model Code, in contrast, does provide separate standards depending on whether counsel testifies on behalf of the client or another party. In the former instance, counsel could testify in the following circumstances: (1) if the testimony would relate to an uncontested matter or mere formality; (2) if the testimony related to the provision of legal services; or (3) if disqualification would render a substantial hardship on the client, regardless of the matter to which counsel testified. The Code, however, provides an absolute bar to representation when the lawyer's testimony would be adverse to the lawyer's client. *See* Model Code of Prof'l Responsibility DR 5-101, DR-5-102.

will not satisfy the ethical constraints set out above. First, under all three rule formulations, adverse testimony would require Lucio's consent to the resulting conflict of interest between his counsel and himself; otherwise, the continued representation would be in clear contravention of the rules. Lucio, however, has taken the position that the conflict is "unwaiveable," and has refused to consent to or waive any conflict of interest. Further, since the recording in question is probative of the Government's allegations against Lucio in Count Four, a significant likelihood exists that at least a portion of Blaylock's testimony would necessarily be adverse to his client. "When the lawyer's testimony would be adverse to an important interest of a present . . . client . . . a conflict exists between the lawyer's duty to testify truthfully and the client's interest in avoiding adverse testimony." *Restatement (Third) of Law Governing Lawyers* § 108 cmt. f. *See also Uptain v. United States*, 692 F.2d 8, 10 (5th Cir. 1982) ("Counsel could not possibly have been an effective advocate when the aim of his primary argument to the jury should have been to diminish the weight, if not the credibility, of his own testimony."). Because it is clearly conceivable that Blaylock could become an adverse witness to his client at trial, a conflict of interest could certainly result between him and Lucio, to which Lucio has refused to consent and waive. Blaylock's continued representation would therefore constitute a violation of Defendant's Sixth Amendment right to conflict-free representation.

In addition, even if Blaylock's testimony favored his client, the testimony would not relate to an uncontested issue or a matter of formality. Rather, the testimony will touch upon two issues the Court is certain will be hotly contested—whether Lucio had motive to commit the crime alleged in Count Four, and the veracity of Limas.

22

Additionally, by testifying in this regard, Blaylock would submit himself to rigorous cross-examination by the Government. "If Mr. Blaylock does take the stand to attack Abel Limas' credibility, then his own credibility becomes relevant and he would be subject to impeachment like any other witness." [Doc. No. 114 at 6-7]. Blaylock would then be forced into "the obviously embarrassing predicament of testifying and then having to argue the credibility and effect of his own testimony." Model Code of Prof'l Responsibility DR 5-102 n.31. This is especially true given that he would be confronted with his own taped conversation.

Further, Blaylock's dual advocate-witness role is likely to confuse the jury and threaten the integrity of the proceeding as a whole. *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.08 cmt. 4 ("[T]he principal concern over allowing a lawyer to serve as both an advocate and witness for a client is the possible confusion that those dual roles could create for the finder of fact."); Model Rules of Prof'l Conduct R. 3.7 cmt. [3] ("To protect the tribunal, paragraph (a) prohibits a lawyer from simultaneously serving as advocate and necessary witness except in those circumstances specified in paragraphs (a)(1) through (a)(3)."). "A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or an analysis of the proof." Tex. Disciplinary Rules Prof'l Conduct R. 3.08 cmt. 4. The Court has an independent duty to ensure the fairness and integrity of Defendant's trial. Allowing defense counsel to testify on a hotly contested issue, in contravention of the ethical standards that both govern such conduct and aim to protect

the integrity of the adversarial system, would violate this independent judicial duty as well.

Finally, the Court notes that Defendant claims that Blaylock's disqualification would cause him substantial prejudice. [*See* Doc. No. 116 at 9-10]. "Depriving Mr. Lucio of his counsel of choice in a case as complex as this one, and at this late hour, would substantially prejudice Mr. Lucio in numerous ways, including prejudicing his interest in promptly clearing his name and having to secure new and competent legal counsel." [*Id.* at 10]. This Court cannot find, based on this bare conclusory statement, that Defendant would indeed be prejudiced as he claims. Defendant has not submitted affidavits or any other evidence in support of this allegation. Further, this Court has granted a continuance and postponed the trial in order to allow for new counsel to prepare. [Tr. 17:5-11].

More importantly, as is clear from the ethical rules described above, substantial hardship may only excuse counsel from the general prohibition of serving as both an advocate and witness when the advocate's testimony would be *favorable* to the client. The commentary to the Model Rules, for instance, explicitly specifies that:

> . . . if there is likely to be substantial conflict between the testimony of the client and that of the lawyer the representation involves a conflict of interest that requires compliance with Rule 1.7. This would be true even though the lawyer might not be prohibited by paragraph (a) from simultaneously serving as advocate and witness because the lawyer's disqualification would work a substantial hardship on the client.

Model Rules of Prof'l Conduct R. 3.7 cmt. [6]. *See also Restatement (Third) of Law Governing Lawyers* § 108 cmt. f (exception for substantial hardship does not relate to whether counsel may continue representation despite conflict of interest). Compliance

24

with the governing ethical standards therefore requires adherence to both set of rules—those governing conflicts of interest, as well as those specifically triggered by counsel becoming a witness. This Court has already discussed the significant likelihood that Blaylock's testimony would be *adverse* to Lucio. Since Lucio has refused to consent to any concurrent conflict between him and Blaylock, any detriment that would follow from Blaylock's disqualification would not cure all issues regarding Blaylock's possible testimony with which this Court is concerned. Most importantly, Blaylock has already indicated he will not represent Lucio as zealously as he otherwise would. Hardship, had it been proven, is not an exception to this actual conflict either. The Court is therefore not persuaded that Blaylock's representation should continue based on Defendant's bare allegation of substantial hardship.

## C. This Conflict is not Government-Manufactured

Defendant, insisting that Blaylock continue in his representation, yet conceding that the conflict arising from the recording in question is "unwaiveable," posits instead that the Government should be prohibited from introducing the recording at all. [Tr. 7:19-8:1, 8:13-14]. Defendant's argument is that the Government, by failing to bring the potential conflict to the Court's or Defendant's attention at an earlier time, essentially "manufactured" the conflict. According to Defendant, "[t]he mere fact that the government did not say anything to the court evidences they had no true intention of introducing the evidence until the undersigned became a thorn in their side." [Doc. No. 116 at 6]. Distilled to its basic form, Defendant's argument is that the Government is using the evidence in question as a mere tactic to deprive Defendant of his counsel of choice.

In instances where defense counsel's disqualification would be based on a conflict of interest, Defendant "rightly points out that the Government may seek to 'manufacture' a conflict in order to prevent a defendant from having a particularly able defense counsel at his side." *Wheat*, 486 U.S. at 163. The ethical constraints and advocate-witness rules outlined above similarly betray a concern that disqualification of opposing counsel could be used as an improper litigation tactic. *See* Tex. Disciplinary Rules Prof'l Conduct R. 3.08 cmt. 10 (rules against advocate acting as witness "should not be used as a tactical weapon to deprive the opposing party of the right to be represented by the lawyer of his or her choice."); *Restatement (Third) of Law Governing Lawyers* § 108 cmt. 1 (party may only call opposing counsel to witness stand when there is a "compelling need"). The Court must therefore consider any possible improper motive by the Government before ordering defense counsel disqualified. *See Wheat*, 486 U.S. at 163 (court should consider possibility that Government manufactured conflict along with all other relevant factors).

The circumstances of this case lead the Court to conclude that the Government has not "manufactured" in any fashion the conflicts in question. First, the communication was intercepted by the Government in January 2008, more than five years ago. In no instance, moreover, has Defendant argued that the Government's interception was not procured by legal means. Further, the recording was made pursuant to a wiretap on the phone of Judge Limas, and there was no intention at the time the wire was approved to pursue either Lucio or Blaylock. [*See* Doc. No. 114 at 1-2]. Second, the Government maintains that it timely provided the defense with the recording in question in the course of regular discovery, [*see id.* at 3], a fact that Defendant concedes is true,

[*see* Doc. No. 116 at 11]. The fact that Lucio and Blaylock did not recognize and/or focus on this recording earlier is not the Government's fault.

Additionally, the Government has repeatedly proven amenable to solutions that would lessen the need for defense counsel's disqualification. *Cf. United States v. Diozzi*, 807 F.2d 10 (1st Cir. 1986) (defense counsel wrongly disqualified where government insisted on calling counsel as witness and refused to stipulate to relevant facts). First, the Government agreed to not use the evidence in its principal case. [*See* Doc. No. 114 at 3]. Secondly, the Government indicated that that it would not move to disqualify Blaylock if the Court admonished and obtained from Defendant an in-court waiver of the conflicts of interest presented by the circumstances. [*See* Doc. No. 114 at 7]. The Government moreover agreed to the severance requested by Defendant to protect his counsel of choice, [Tr. 2:10-13], and responded enthusiastically to the Court's suggestion of a redaction that would eliminate all references to Blaylock, [Tr. 7:1-6, 17:16-19]. All of the Government's efforts in this regard have been summarily rejected. The Government has only stopped short of agreeing to not introduce the recording in question at all. "The evidence, however, is relevant to the government's case . . . and cannot be excluded to accommodate a defendant's counsel of choice." *United States v. Urbana*, 770 F. Supp. 1552, 1559 n.17 (citing *United States v. Pungitore*, 910 F.2d 1084, 1142-43 (3rd Cir. 1990)).

Accordingly, because the Court finds no factual basis for Defendant's claim that the Government has "manufactured" the current conflict or engaged in any other misconduct, the Court **DENIES** Defendant's Motion for Sanctions Due to Manufacturing Actual, Unwaiveable Conflict; and/or Motion for Hearing Relating to

27

Late Disclosure; alternatively, Motion to Sever [Doc. No. 116], to the extent that said motion rests on misconduct allegations.[15]

## IV. Conclusion

This Court has attempted at all moments to give effect to Defendant's right to counsel of choice. The Court has granted the severance requested, proposed solutions suggested in the caselaw addressing analogous situations, and conducted a *Garcia* hearing—all in an effort to respect Defendant's expressed desire that Blaylock continue representing him. The conflicts between Blaylock's personal interests and those of Lucio discussed herein, however, clearly will inhibit the zealousness and quality of Blaylock's representation, and thus his effectiveness as an advocate. Defendant recognizes the gravity of the situation and has decided not to waive the conflicts of interest at issue. [*See* Doc. No. 140 at 4]. Therefore, the Court is faced with two competing Sixth Amendment rights: Defendant's right to counsel of choice, which calls for Blaylock's continued representation; and Defendant's right to effective assistance of counsel, which compels Blaylock's disqualification.

> The district court should not be placed in the no-win situation of being confronted with a claim of a Sixth Amendment violation . . . regardless of whether it has ceded to the defendant's expressed desire to be represented by his conflict-ridden attorney, or has taken it upon itself to disqualify the attorney.

*United States v. Pungitore*, 910 F.2d 1084, 1143 n.84 (3rd Cir. 1990). The Court has a duty to protect Defendant's right to a conflict-free and effective advocate. In addition,

---

[15] The Court hereby also **DENIES** Defendant's request for a further hearing regarding these issues. [*See* Doc. No. 116 at 17].

the Court must safeguard the integrity of the judicial system and ensure the observance of well-recognized ethical standards for legal representation. The Southern District of Texas has adopted the Texas Disciplinary Rules of Professional Conduct as the minimum standard of practice for attorneys appearing before it. The Fifth Circuit has further announced that disqualification issues are "governed by the ethical rules announced by the national profession[,]" *In re Am. Airlines*, 972 F.2d at 610 (internal quotation marks omitted), a criterion which certainly includes consideration of the Texas Rules, as well as the Model Rules and the *Restatement* standards discussed herein. All rule formulations counsel against Blaylock's continued representation. Lucio, himself, admits the existence of a conflict and describes it as unwaiveable. Thus, if Blaylock remained as Lucio's advocate, the integrity of the system, the fairness of the trial, and Defendant's own Sixth Amendment right to conflict-free representation would all be jeopardized.

Accordingly, as required by its duty to protect Defendant's rights and the fairness of the trials before it, the Court **ORDERS** Mr. Blaylock **DISQUALIFIED** from serving as defense counsel in the above-styled cause. Lucio has thirty days to engage or petition the Court to appoint (if indigent) new counsel.

Signed this __18__ day of April, 2013.

Andrew S. Hanen
United States District Judge